THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVIS GEORGE MISKAM, | ) CIVIL NO. 2:08-02229 JMS |
| | ) |
| Plaintiff, | ) ORDER (1) GRANTING |
| | ) DEFENDANTS' MOTION FOR |
| vs. | ) SUMMARY JUDGMENT; AND |
| | ) (2) DENYING PLAINTIFF'S |
| S. MCALLISTER, et al., | ) MOTION FOR RECONSIDERATION |
| | ) OF THE COURT'S ORDER OF |
| Defendants. | ) SEPTEMBER 21, 2010 GRANTING |
| | ) IN PART AND DENYING IN PART |
| | ) DEFENDANTS' MOTION FOR |
| _____ | ) SUMMARY JUDGMENT |

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER OF SEPTEMBER 21, 2010 GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In this action, pro se prisoner Travis George Miskam ("Plaintiff") asserts (1) a claim against Defendant T. Felker ("Warden Felker") based on the ban of various publications at California's High Desert State Prison ("HDSP") including the Art of War, Juxtapoz, Art of Seduction, and 48 Laws of Power; and (2) a claim against Defendant D. Davey ("Captain Davey") based on his refusal to provide Plaintiff with the magazine Resistance and the comic book Satan's Sodomy Baby.

Currently before the court is Defendants' Motion for Summary Judgment, in which they argue that Plaintiff failed to administratively exhaust his claims against Warden Felker, and that Captain Davey's refusals to provide Plaintiff Resistance or Satan's Sodomy Baby did not violate Plaintiff's First Amendment rights because the denials were rationally related to legitimate penological interests.  Based on the following, the court agrees and GRANTS Defendants' Motion for Summary Judgment.

## II. <u>BACKGROUND</u>

**A.    Factual Background**

*1.    Resistance*

On September 18, 2007, while housed at HDSP, Plaintiff was mailed an issue of Resistance.  Defendants' Concise Statement of Facts ("Defs.' CSF") ¶ 6.[1]  Upon review, Captain Davey found that Resistance expressed racially biased viewpoints, *id.*, and he refused to provide Resistance to Plaintiff on the grounds that it contained racially inflammatory material in violation of Cal. Code Regs. ("CCR") tit. 15 § 3006(c)(1).[2]  Davey Decl. ¶¶ 5-7.  Captain Davey believed that

---

[1] Where the facts are undisputed, the court cites directly to Defendants' CSF.

[2] Section 3006(c)(1) prohibits inmates from possessing "any matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group."

allowing Plaintiff to receive Resistance would incite racial violence at HDSP, *id.* ¶ 7, which had been on lockdown fifteen times due to racial tension in the five years prior to Plaintiff's request. *Id.* ¶ 6. Contrary to Captain Davey's characterization of Resistance, Plaintiff describes it as a "music magazine with band interviews, concert updates, cd reviews, book reviews, historical essays, and sports interviews." Pl.'s Opp'n at 13.

Plaintiff receives Resistance at his current prison, and provides as an exhibit a copy of the issue he was denied. *See* Pl.'s Ex. C. Upon review of Resistance, the court finds that although it includes articles, book reviews, and music reviews, the entire content of Resistance is permeated with white supremacist ideology. For example, titles of articles include "Aryan Solidarity Campout -- Ian Stuart Memorial Weekend," "Interview: Definite Hate -- Unite and Fight!," "White Lyrics Page," "Proud Aryan Women," and "Proud White Athlete: The Enforcer on Ice." *Id.* at 3. The book review -- "Setting the Record Straight (Letters from Cell # 7)" -- is a collection of letters from a Holocaust denier "who has felt the Iron Heel of Jewish power directly on his neck for decades." *Id.* at 12. Other articles exalt white unification and a general dislike of other races. *See, e.g.*, *id.* at 8 (describing the "Aryan Solidarity Campout" where "we all stood together as soldiers in the fight for white survival"); at 17 (interview with musician Rob

"Darken" Fudali asserting that "natural instinctive aversion to non-Whites . . .

saves the country against the cataclysm of multiracism"); at 26 (interview with the

music group "The Lordz of Hate," where "Ymir" explains that "[y]ou'll rarely see

Blacks venturing far from the projects; Jews keep to their areas as do the Italians,

Irishm Hellenes, etc.  So you have definitely find a nice area to live in NY, it's just

that rush hour and shopping is where you'll run into muds, Jews, etc."); at 29-34

("I Remain Loyal to the Cause," an interview with a fifth-generation Klansmen and

Imperial Wizard who expresses anger at the federal prison system for housing him

with Black inmates and discusses the problem of women committing "interracial

suicide").

   Other content goes beyond expressions of white supremacy and

solidarity by arguably suggesting violence to ensure the continuance of the white

race.  For example, the Editorial asserts that "[t]he schemes of Jews and the peril

our race is in are so obvious.  Why won't our people stand up and save

themselves?  When will we have our White homeland?"  *Id.* at 4.  The short article

"The Rebel, Definite Hate: Unite and Fight!" shares the message to "[s]top the

bullshit, get off your asses, and Unite & Fight!  If only one kid wakes up and starts

fighting for his race, then I feel it's worth it."  *Id.* at 13.  Finally, the "White

Lyrics" page includes the lyric, "[a]n agent in cahoots with the fucking Jew;

Fucking snitch we know your name; Fucking snitch, we'll hound your trail; Fucking snitch, we play no games; Fucking snitch tells no more tales!"  *Id.* at 23. As should be painfully obvious from this recitation, Resistance is a magazine directed to white supremacists and supports violence against non-white races.

### 2.    *Satan's Sodomy Baby*

On December 13, 2007, while still housed at HDSP, Plaintiff was mailed a comic book entitled "Satan's Sodomy Baby."  Defs.' CSF ¶ 10.  Captain Davey refused to provide Plaintiff with the comic book, this time on the basis that it "vividly depicts, displays and describes penetration of the anus and contact between the genitals and mouth[, and] that throughout the comic were descriptions of sexual acts and exhibitions of frontal nudity of the male and female breasts and genitals," in violation of, among other provisions, §§ 3006(c)(1), (15), and (17).[3] *See* Davey Decl. ¶ 11, 12; *see also* Defs.' CSF ¶ 12.

///

///

---

[3]  Section 3006(c)(15) prohibits "obscene material and mail containing information concerning where, how, or from whom obscene material may be obtained," while § 3006(c)(17) prohibits "sexually explicit images that depict frontal nudity in the form of personal photographs, drawings, magazines, or other pictorial format."  "Obscene material" is defined as "material taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest; and is material which taken as a whole, depicts or describes sexual conduct; and which, taken as a whole, lacks serious literary, artistic, political, or scientific value."  CCR tit. 15 § 3006(c)(15)(A).

### 3.    *Plaintiff's Claims Against Warden Felker*

As to Plaintiff's claim against Warden Felker for approving a ban on a number of publications including The Art of War, Juxtapoz, The Art of Seduction, and 48 Laws of Power, there is no evidence that Plaintiff filed any administrative grievances regarding these materials.  Rather, Plaintiff grieved and appealed only HDSP's denial to provide him a copy of Resistance and the placement of the magazine on a list of banned publications.  *See* Pl.'s Ex. A; *see also* Robertson Decl. ¶¶ 7-8.  At all four levels of the review process, prison officials denied Plaintiff's request to rescind the restriction on Resistance or to provide Plaintiff a copy of Resistance.  *Id*. at 20-25.

## B.    Procedural Background

On September 22, 2008, Plaintiff filed this action pursuant to 42 U.S.C. § 1983.  In a February 10, 2009 Order Dismissing Complaint in Part, the court allowed Plaintiff's claims to proceed against Captain Davey, S. McAllister, N. Grannis, M. Keating, M.D. McDonald, T.R. Mossinger, R.L. Gower, R. Pimatel, K.J. Allen, and Warden Felker for confiscating or denying Plaintiff access to certain publications.

On July 14, 2010, Defendants filed a Motion for Summary Judgment, and the September 21, 2010 Order Granting in Part and Denying in Part the Motion

for Summary Judgment (the "September 21, 2010 Order") followed.  As a result of the September 21, 2010 Order, Plaintiff's remaining claims include (1) a claim against Captain Davey based on the refusal to provide Plaintiff with Resistance and Satan's Sodomy Baby; and (2) a claim against Warden Felker based on the ban of various publications including the Art of War, Juxtapoz, Art of Seduction, and 48 Laws of Power.

On December 14, 2010, Plaintiff filed a Motion for Reconsideration of the September 21, 2010 Order.  On December 17, 2010, Defendants filed a Motion for Leave to File a Motion for Summary Judgment and proposed Motion for Summary Judgment.  On December 20, 2010, the court granted Defendants' Motion for Leave to File a Motion for Summary Judgment and deemed filed Defendants' proposed Motion for Summary Judgment.  The court further explained that it would address the Motion for Summary Judgment and the Motion for Reconsideration at the same time because the arguments raised in Defendants' Motion for Summary Judgment apply equally to the Defendants who were dismissed in the September 21, 2010 Order.  *See* Doc. No. 62.

On February 14, 2011, Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment.  On February 25, 2011, Defendants filed a Reply in support of their Motion for Summary Judgment, and an Opposition to Plaintiff's

Motion for Reconsideration.  Pursuant to Local Rule 230(l), the court determines these Motions without a hearing.

### III.  <u>STANDARDS OF REVIEW</u>

**A.      Failure to Exhaust**

Pursuant to the Prison Litigation Reform Act of 1995 (the "PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Prisoners are required to exhaust the available administrative remedies prior to filing suit.  *Jones v. Bock*, 549 U.S. 199, 211 (2007); *McKinney v. Carey*, 311 F.3d 1198, 1199-1200 (9th Cir. 2002) (per curiam).  Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered through administrative procedures.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).  The exhaustion requirement applies to all prisoner suits relating to prison life.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Section 1997e(a) does not impose a pleading requirement, but rather provides an affirmative defense under which defendants have the burden of raising and proving the absence of exhaustion.  *Jones*, 549 U.S. at 216; *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).  The failure to exhaust nonjudicial

administrative remedies that are not jurisdictional is subject to an unenumerated

Rule 12(b) motion, rather than a summary judgment motion.  *Wyatt*, 315 F.3d at

1119 (citing *Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d

365, 368 (9th Cir. 1998) (per curiam)).  The court may look beyond the pleading

and consider evidence, under "a procedure closely analogous to summary

judgment."  *Id.* at 1119 n.14.

**B.**     **Summary Judgment**

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  The burden initially lies with the moving party to show that there

is no genuine issue of material fact.  *See Soremekun v. Thrifty Payless, Inc.*, 509

F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)).  If the moving party carries its burden, the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material

facts [and] come forward with specific facts showing that there is a *genuine issue*

*for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87

(1986) (citation and internal quotation signals omitted).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on

which a reasonable fact finder could find for the nonmoving party, and a dispute is

9

'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248 (1986)).   When considering the evidence on a

motion for summary judgment, the court must draw all reasonable inferences on

behalf of the nonmoving party.   *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.  <u>ANALYSIS</u>

### A.     Defendants' Motion for Summary Judgment

Defendants seek summary judgment on both Plaintiff's claims

(1) against Warden Felker based on the ban of various publications including the

Art of War, Juxtapoz, Art of Seduction, and 48 Laws of Power, and (2) against

Captain Davey based on his refusal to provide Plaintiff with Resistance and Satan's

Sodomy Baby.   The court addresses these claims in turn.

#### 1.     *First Amendment Claims Against Warden Felker*

Warden Felker moves for summary judgment on Plaintiff's claims

that he violated Plaintiff's First Amendment rights by approving a ban on a number

of publications on the basis that Plaintiff failed to properly exhaust his

administrative remedies related to these claims as required by the Prison Litigation

Reform Act of 1995 (the "PLRA").   *See* Defs.' Mot. 10-13.

As an initial matter, although Warden Felker asserts the defense of

lack of exhaustion as seeking summary judgment, failure to exhaust actually raises an unenumerated Rule 12(b) motion, and the court must treat it as such.  *See Studio Elec. Techs. Local 728 v. Int'l Photographers of Motion Picture Indus., Local 659*, 598 F.2d 551, 552 n.2 (9th Cir. 1979) (stating that the defense of failure to exhaust should be treated as raised as a motion to dismiss "even though [it is] raised by a motion for summary judgment"); *Donte v. Swingle*, 2011 WL 976613, at \*3 (E.D. Cal. Mar. 16, 2011).  Accordingly, in determining failure to exhaust, the court treats Defendants' argument as raising an unenumerated Rule 12(b) motion, and the court may look beyond the pleadings and decide disputed issues of fact.  *Wyatt*, 315 F.3d at 1119-20.

Turning to the merits of Warden Felker's argument, the California Department of Corrections and Rehabilitation ("CDCR") has a multi-step administrative grievance system for prisoner complaints.  *See* CCR tit. 15 §§ 3084.1- 3084.5.  In order to satisfy the PLRA, California state prisoners are required to use this process to exhaust their claims prior to filing suit.  *Woodford v. Ngo*, 548 U.S. 81, 85-86 (2006); *McKinney*, 311 F.3d at 1199-1201.  Although Plaintiff used this process and went through all of the steps for his grievance of being denied Resistance and its inclusion of the list of banned periodicals, *see* Pl.'s Ex. A, there is no evidence that Plaintiff filed any grievances regarding the banned

11

publication list other than its inclusion of Resistance.  *See* Robertson Decl. ¶¶ 7-8.

Accordingly, Plaintiff's administrative remedies were exhausted as to Resistance

and its inclusion of the list of banned periodicals, but not exhausted as to the

inclusion of any of the other named periodicals or the existence of the list itself.

In opposition, Plaintiff argues that he exhausted his administrative

remedies as to the banned list in grieving Resistance and that to file a separate

appeal for each publication would have been futile.  The court rejects this argument

-- Plaintiff's grievance and administrative appeals were limited to Resistance such

that HDSP had no notice that Plaintiff contested the listing of any of the other

publications.  To accept that Plaintiff also implicitly grieved other materials on the

banned list would defeat the very purpose of requiring administrative exhaustion --

to protect agency authority and promote efficiency by allowing agencies to correct

their own mistakes before being haled into federal court.  *See Woodford*, 548 U.S.

at 89-90.  Further, there is no futility exception to the PLRA exhaustion

requirement.  *See Booth*, 532 U.S. at 741 n.6;  *Massey v. Wheeler*, 221 F.3d 1030,

1034 (7th Cir. 2000).

Because Plaintiff failed to exhaust his claim against Warden Felker

for approving a ban on a number of publications, the court GRANTS Defendants'

Motion as to Plaintiff's claims against Warden Felker.

### 2.    *Claims Regarding Resistance and Satan's Sodomy Baby*

Captain Davey denied Plaintiff Resistance pursuant to § 3006(c)(1), and Satan's Sodomy Baby pursuant to §§ 3006(c)(1), (2), (15), and (17).  Plaintiff does not facially challenge the constitutionality of these CCR provisions, but rather raises an as-applied challenge that the denial of these publications pursuant to these provisions was not reasonably related to penological interests.

The court must review these denials under the "deferential" four-factor standard established by *Turner v. Safley*, 482 U.S. 78 (1987):

> First and foremost, there must be a valid, rational, connection between the prison regulation and the legitimate and neutral governmental interest put forward to justify it.  If the connection between the regulation and the asserted goal is arbitrary or irrational, then the regulation fails, irrespective of whether the other factors tilt in its favor.  In addition, courts should consider three other factors: the existence of alternative means of exercising the right available to inmates; the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and the absence of ready alternatives available to the prison for achieving the governmental objectives.

*Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (citing *Turner*, 482 U.S. at 89-90) (internal punctuation omitted).  This framework applies to both facial and as-applied challenges, and inmates who challenge a regulation's application face the "heavy burden" of overcoming "the presumption that the prison officials acted

13

within their broad discretion." *Id.* The court applies this framework to each of the publications in turn.

      *a.*    *Resistance*

Plaintiff challenges Captain Davey's denial of Resistance and its inclusion on the list of banned periodicals pursuant to § 3006(c)(1) based on Captain Davey's assessment that Resistance would incite further racial violence at HDSP. Applying the *Turner* factors, the court finds that Plaintiff has not carried his "heavy burden" in challenging the constitutionality of this denial.

As to the first *Turner* factor, the inclusion of Resistance on the list of banned publications and Captain Davey's subsequent review, assessment, and denial of Resistance pursuant to § 3006(c)(1) was reasonably related to the government's neutral and legitimate interest of ensuring the safety and security of HDSP. *See Turner*, 482 U.S. at 90. Section 3006(c)(1), prohibiting inmates from possessing "any matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group," is clearly directed to prison safety, a legitimate interest central to all other correctional facility objectives. *See Pell v. Procunier*, 417 U.S. 817, 823 (1974) (explaining that central to all other legitimate penal interests "is the institutional consideration of internal security within the corrections facilities

14

themselves").

Restricting inmates' access to racially inflammatory material, such as Resistance, is logically related to furthering that goal. *See Winson v. Marshall*, 1996 WL 266131, at *3 (N.D. Cal. May 15, 1996) (finding that the prevention of violence as a result of racial tension is clearly a legitimate governmental interest in the context of administering a prison). In the five years prior to the denial of Resistance, there were fifteen recorded incidents of lockdown at HDSP as a result of racial tension. Davey Decl. ¶ 6. During that time, Resistance was included on the banned list of publications pursuant to § 3006(c)(1) because of its tendency to incite violence due to its racially motivated content. *See* Pl.'s Ex. A. Further, even though Resistance was on the list of banned publications, before denying Plaintiff with the copy that was mailed to him, Captain Davey personally reviewed it before determining that it would contribute to racial unrest among the inmate population and violated § 3006(c)(1). *See* Davey Decl. ¶¶ 4, 5.

As to the second *Turner* factor, although Plaintiff was denied Resistance, the regulations allow Plaintiff access to a broad range of other publications such that he can still exercise his First Amendment rights. *See Thornburgh v. Abbott*, 490 U.S. 401, 417-18 (1989) (reasoning that the second *Turner* factor was satisfied because although prison authorities could withhold

publications from inmates if determined to be detrimental to security, the

regulation allowed a broad range of publications to be sent, received, and read).

Indeed, if Plaintiff wanted Resistance for its articles on music, history, sports, and

book reviews, Plaintiff could certainly receive such publications that do not

include Resistance's racially motivated themes.  *See id.* at 417-18 (explaining that

alternatives need not afford inmates with the same forms of communication they

seek, just other means of expression).

As to the third *Turner* factor, allowing Plaintiff Resistance would

potentially impact the liberty and safety of both other inmates and guards at HDSP.

Where, as is the case here, the right in question "can be exercised only at the cost

of significantly less liberty and safety for everyone else, guards, and other

prisoners alike," *Turner*, 482 U.S. at 92, the court should defer to the professional

judgment of prison administrators.  *Id.* at 90.  Given the history of racially

motivated violence at HDSP and Resistance's racially inflammatory theme, other

prisoners could certainly observe the racially based materials in Plaintiff's

possession, draw conclusions about his beliefs and affiliations, and further the

racial tension and violence.  Violence, of course, would also jeopardize safety of

correctional officers charged with maintaining the peace at HDSP.  *See*

*Thornburgh*, 490 U.S. at 418 (reasoning that "[where] the class of publications to

be excluded is limited to those found potentially detrimental to order and security;

the likelihood that such material will circulate within the prison raises the prospect

of precisely the kind of 'ripple effect' with which the Court in *Turner* was

concerned").

      Finally, there is no evidence that the denial of Resistance was an over-

exaggerated response to HDSP's legitimate interest in maintaining the safety of the

facility.  *Turner* explains that "if an inmate can point to an alternative that fully

accommodates the prisoner's rights at *de minimis* cost to valid penological

interests, a court may consider that as evidence that the regulation does not satisfy

the reasonable relationship standard."  *Turner*, 482 U.S. at 90-91; *see also Casey v.*

*Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993) (placing the burden on the prisoner to

demonstrate an alternative that accommodates their rights at de minimis cost to

security interests).   Plaintiff does not point to any easy or obvious alternatives,

other than to allow Resistance to be distributed and discipline inmates should

incidents of violence arise.  Pl.'s Opp'n at 5.  Disciplining inmates after a violent

altercation, however, places the safety of other inmates and guards in jeopardy,

thwarting HDSP's goal of maintaining prison security and safety.

      In opposition, Plaintiff argues that banning Resistance because of

"past racial violence" at HDSP is an overbroad response to prison concerns

because there is no evidence that Resistance has led directly to any racially charged conflict.[4]  Plaintiff's argument misses the mark -- a prison need not show that a banned publication actually caused conflict; the focus is instead on whether the ban is reasonably related to a penological interest.  *See Thornburgh*, 490 U.S. at 417 (considering it rational that prison administrators excluded materials that "although not necessarily likely to lead to violence, are determined  . . .  to create an intolerable risk of disorder under the conditions of a particular prison at a particular time").  Indeed, Defendants need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future.  *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999).  Rather, the denial of Resistance need only be reasonably related to the legitimate penological interest of internal security within the HDSP.

        In sum, in light of the reasonableness factors established in *Turner*, the court finds that Plaintiff failed to establish a genuine issue of material fact that the denial of Resistance, as well as its inclusion on the list of banned publications, was not reasonably related to the prison's legitimate and important objective of maintaining the safety and security of HDSP pursuant to § 3006(c)(1).  The court

---

        [4] Plaintiff also argues that Captain Davey's denial was unreasonable because Plaintiff is now able to receive Resistance at the new facility he has been assigned.  Pl.'s Opp'n at 6.  This argument is irrelevant; Captain Davey's assessment of the consequences and subsequent denial of Resistance to Plaintiff was made based on the particular conditions and events at HDSP.

therefore GRANTS Defendants' Motion for Summary Judgment on the denial of Resistance and its inclusion on the list of banned publications.

      b.    *Satan's Sodomy Baby*

Plaintiff challenges Captain Davey's denial of Satan's Sodomy Baby based on his assessment that it violated §§ 3006(c)(15) and (17) prohibiting inmates from possessing obscene or explicit material.[5]  Applying the *Turner* factors, the court finds there is no genuine issue of material fact that denial of Satan's Sodomy Baby was a valid restraint on Plaintiff's rights.

As to the first *Turner* factor, the denial of Satan's Sodomy Baby pursuant to §§ 3006(c)(15) and (17) was reasonably related to legitimate and neutral penological interests.  The regulations prohibit prisoners from possessing, among other things, obscene materials, materials that depict or describe penetration of the vagina or anus, contact between the mouth and genitals, and frontal nudity. *See* CCR tit. 15, §§ 3006(c)(15) and (17).  Both provisions have been found to be facially constitutional as valid restrictions in the prison setting -- each regulation is reasonably related to the legitimate penological interests of maintaining the safety and security of the prison, rehabilitating inmates, reducing sexual harassment of

---

[5]  Captain Davey also found that Satan's Sodomy Baby violated §§ 3006(c)(1) and (2). Given that the court finds that Captain Davey properly denied Plaintiff this comic book based on §§ 3006(c)(15) and (17), the court need not address these additional reasons for denying Plaintiff this publication.

officers, and preventing a hostile work environment.  *See Nelson v. Woodford*,

2006 WL 571359, at *3-6 (N.D. Cal. Mar. 2, 2006) (finding §§ 3006(c)(15) and

(17) constitutionally valid regulations), *aff'd*, 249 Fed. Appx. 529 (9th Cir. 2007);

*Dawson v. Scurr*, 986 F.2d 257, 261 (8th Cir. 1993) (upholding the validity of

Iowa state regulations restricting access to sexually explicit material because they

were reasonably related to goals of prison security and inmate rehabilitation);

*Mauro*, 188 F.3d at 1060 (upholding validity of Arizona regulations prohibiting

inmates from possessing sexually explicit material).  Captain Davey therefore

simply applied these regulations -- and forwarded this legitimate penological

interest -- when he found that Satan's Sodomy Baby violated these provisions

because it "vividly depicts, displays and describes penetration of the anus and

contact between the genitals and mouth[, and] that throughout the comic [are]

descriptions of sexual acts and exhibitions of frontal nudity of the male and female

breasts and genitals."  Davey Decl. ¶ 11.

The second *Turner* factor, the availability of alternative means to

exercise the right in question, also supports the reasonableness of the Captain

Davey's decision not to provide Plaintiff with Satan's Sodomy Baby.  When

considering the availability of alternative means of exercising the right at issue, the

law allows that right to be viewed "sensibly and expansively."  *Thornburgh*, 490

U.S. at 417.  Plaintiff is not prevented from receiving other comic books or periodicals that do not display the frontal nudity or obscene material prohibited by the regulations.  *See, e.g.*, *Harper v. Wallingford*, 877 F.2d 728, 733 (9th Cir. 1989) (reasoning that although there were no available alternatives to accessing material espousing consensual sexual relations between adult males and juvenile males, the second *Turner* factor was satisfied because prisoner was still able to access materials that did not violate the prison's security policy); *see also* Pl.'s Ex. D ("The Goon," another comic book by the same author as Satan's Sodomy Baby).

As to the third *Turner* factor, dissemination of Satan's Sodomy Baby would have a detrimental effect on prison staff as well as other inmates and the allocation of prison resources.  Other courts reviewing similar regulations have found that the dissemination of obscene materials could lead to bartering of sexually explicit materials, violence among inmates stemming from the possession or use of such materials, and harassment of correctional officers.  *See Mauro*, 188 F.3d at 1061 (affirming the finding that access to sexually explicit material could lead to bartering and anatomical comparisons, which in turn could lead to violence among inmates); *Nelson*, 2006 WL 571359, at *7 (finding that unrestricted access to sexually explicit and obscene materials could lead to sexual harassment of female officers and violence stemming from the possession and use of those

materials).  Such conflicts not only jeopardize the safety of other inmates, but also prison staff.

The final *Turner* factor is satisfied because Plaintiff points to no alternatives that would provide him the right to possess Satan's Sodomy Baby at de minimis cost to the legitimate penological interests of safety and rehabilitation. *See Turner*, 482 U.S. at 91; *Casey*, 4 F.3d at 1523.  There is one particular comic at issue here, the denial of which resulted from Captain Davey's personal review and determination that it contained obscene material.  The denial of Satan's Sodomy Baby is not an "over exaggerated" response, but rather the result of a highly tailored and individual review of the specific comic book at issue.  Such an individual review process protects against the likelihood of a "blanket ban" on materials that might otherwise be impermissible based on their educational or artistic value.  *See Thornburgh*, 490 U.S. at 416 (expressing "comfort" in the individualized nature of a regulation restricting incoming material with the potential to be detrimental to prison security).

In opposition, Plaintiff contests the sexual or obscene nature of Satan's Sodomy Baby because Plaintiff has never reviewed the publication.[6]  Pl.'s

---

[6]  Plaintiff provides the court with comics by the same author in an attempt to demonstrate the non-obscene nature typical of the author's work.  These materials, however, are irrelevant regarding the applicability of §§ 3006(c)(15) and (17) to Satan's Sodomy Baby specifically.

Opp'n at 7.  The court rejects Plaintiff's argument.  Captain Davey clearly

explained the nature of the comic book, and to permit Plaintiff to review Satan's

Sodomy Baby through the discovery process would provide Plaintiff a perverse

incentive to file a lawsuit in order to gain access to a publication that he would not

otherwise be able to receive.

The court therefore GRANTS Defendants' Motion for Summary

Judgment on the denial of Satan's Sodomy Baby.

**B.      Plaintiff's Motion for Reconsideration**

The September 21, 2010 Order dismissed Plaintiffs' claims against

Defendants S. McAllister, N. Grannis, M. Keating, M.D. McDonald, T.R.

Mossinger, R. Pimente, R.L Gower, and K.J. Allen because these Defendants did

not actually deny Plaintiff any publications or confiscate Plaintiff's publications,

but rather were involved in the administrative appeals process only.  *See* Doc. No.

46, at 8-9.  Plaintiff requests that the court reconsider dismissal of his claims as to

M.D. McDonald, R. Pimentel, R.L. Gower, and K.J. Allen because discovery has

revealed and/or will reveal that these Defendants had responsibility for denying

Plaintiff these publications beyond their role in processing Plaintiff's grievance.

*See* Pl.'s Mot. for Reconsideration at 2-3.  The court rejects Plaintiff's request --

regardless of these Defendants' roles in denying Plaintiff access to Resistance,

23

Satan's Sodomy Baby, or any other banned publication, as explained above, these denials did not violate Plaintiff's First Amendment Rights.  In other words, even if the court had not dismissed these Defendants in the September 21, 2010 Order, Plaintiff's claims against them would be dismissed for the same reasons discussed above regarding Plaintiff's claims against Warden Felker and Captain Davey.  The court therefore DENIES Plaintiff's Motion for Reconsideration.

## V.  CONCLUSION

Based on the above, the court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Reconsideration.  The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 20, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Miskam v. McAllister*, Civ. No. 2:08-02229 JMS, Order (1) Granting Defendants' Motion for Summary Judgment; and (2) Denying Plaintiff's Motion for Reconsideration of the Court's Order of September 21, 2010 Granting in Part and Denying in Part Defendants' Motion for Summary Judgment